**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| Joseph M. Clark, | Case No. 2:12-cv-802 |
| Plaintiff, | Judge Graham |
| v. | Magistrate Judge Kemp |
| Shop24 Global, LLC, et al., | |
| Defendants. | |

### OPINION & ORDER

Pending before the Court are the parties' cross-motions for partial summary judgment (docs. 66 & 67). For the reasons that follow, the Court will GRANT IN PART AND DENY IN PART the Defendants' Motion for Partial Summary Judgment (doc. 66) and DENY the Plaintiff's Motion for Partial Summary Judgment (doc. 67).

I.      **Background**

The Plaintiff, Joseph Clark, is a former employee of the Defendants.[1] Defendant Shop24 USA, the predecessor to Defendant Shop24 Global, supplied customers with "self-contained, totally automated and refrigerated convenience store[s]."[2] In 2008, Defendant Shop24 USA hired Matthew Reckner as its first American employee. Reckner Dep. at 7, doc. 67-2. Reckner worked to develop Defendant Shop24 USA's infrastructure and expand its business. Id. at 7–9.

As Defendant Shop24 USA expanded its business, management recognized the need to hire a repair technician to perform maintenance on its vending machines. Id. at 9. After an

---

[1] The Defendants are Shop24 Global, LLC; Shop24 USA, LLC; and RDO Equipment Co. The parties dispute whether RDO Equipment Co. employed the Plaintiff.

[2] See About Shop24, http://www.shop24global.com/about/ (last visited January 12, 2015).

interview with Reckner, Defendant Shop24 USA hired the Plaintiff in May 2009. Clark Dep. at 22, doc. 67-1. Shortly after being hired, the Plaintiff traveled to Belgium to Defendant Shop24 USA's headquarters where he attended training on the maintenance and repair of the vending machines. Id. at 25–26. Following his training, the Plaintiff returned to his home office in Columbus, Ohio. Id. at 27. Reckner also worked in the Columbus office and was the Plaintiff's supervisor. Defs.' Answer to Interrogs. 9, doc. 67-3.

The Plaintiff's job responsibilities are the subject of dispute in this case. It is clear from the record that he performed a wide variety of tasks, including: repairing and installing vending machines, training other repairmen, responding to customer service calls, creating a user manual for the vending machines, and maintaining an inventory of mechanical and electronic components. Clark Dep. at 43, 46, 63–66, 89, 96, 172, 178. The Plaintiff often traveled around the country to perform these responsibilities. Reckner Dep. at 30.

The Plaintiff's work hours were long and variable. He estimated that his average work week was 70 hours, but that some weeks he worked 100 hours, up to 18 hours a day. Clark Dep. at 125. As Defendant Shop24 Global's employee manual explained:

> The normal work day is eight (8) hours, and forty (40) hours represents a normal work week . . . . While you are generally expected to work the number of hours stated above, Company does not guarantee that you will actually be able to perform all of your work duties in this amount of time. You are expected to put in the amount of time over 40 hours per week necessary to complete your job duties and occasionally, in rare circumstances, substantial extra work will be required. If you are overburdened with work and unable to complete your assignments with a moderate amount of additional work each week, please speak to your supervisor; however, with more responsibility and increased pay, usually comes a greater work load and more time spent working.
>
> Exempt employees are not paid overtime for hours worked above 40 hours per week; a moderate amount of expected overtime is built into your compensation package as a salaried employee.

Def.'s Manual at 8–9, doc. 66-3.

2

In July 2009, following a long service trip, the Plaintiff questioned Reckner regarding his entitlement to overtime and his classification as an exempt employee under the Fair Labor Standards Act (FLSA). Clark Dep. at 337. Reckner initially stated that the Plaintiff was a nonexempt employee, but later clarified that the Plaintiff was actually exempt. Id. at 337–38. Consequently, the Plaintiff did not receive overtime pay.

In June 2010, Defendant Shop24 USA sold its assets to Defendant Shop24 Global. Setness Aff. at ¶ 8, doc. 66-6. Defendant Shop24 USA's employees, including the Plaintiff, became employees of Defendant Shop24 Global. At that time, Ken Horner became CEO of Defendant Shop24 Global. Horner Dep. at 6, doc. 67-4. Although corporate ownership changed, the Plaintiff's job responsibilities did not. Clark Dep. at 83.

The Plaintiff continued to work long hours over the next year. In the summer of 2011, Defendant Shop24 Global decided to hire an additional technician. Id. at 28–29. Reckner hired Anthony Weygandt as a service technician. Weygandt Dep. at 7–8. Clark trained Weygandt in maintaining and repairing the vending machines. Id. at 11–12.

In early 2012, the Plaintiff began researching laws concerning overtime payment. Clark Dep. at 256. After reviewing information regarding exemption classifications under the FLSA, the Plaintiff emailed Marvin Setness, an administrator for Defendant Shop 24 Global,[3] concerning his exempt classification under the FLSA. Id. at 163, 255–56. The Plaintiff made a similar enquiry to Reckner. Id. at 256. Reckner informed the Plaintiff that he was unaware of the FLSA's classification system, but, after speaking with management, opined that the Plaintiff was exempt because of his job title. Id. at 256–59.

---

[3] The Plaintiff refers to Setness as the "controller for RDO Equipment Co. and Shop24 Global." Pl.'s Mot. for Partial Summ. J. at 6, doc. 66. The Defendants refer to Setness as Defendant Shop24 Global's "payroll administrator." Defs.' Mot. for Partial Summ. J. at 4, doc. 67. In his affidavit, Setness states that he is "employed by R.D. Offutt Company, but [his] salary is allocated to PROffutt Limited Partnership. PROffutt Limited Partnership is an owner of Shop24 Global, LLC." Setness Aff. at ¶ 2.

Following this exchange, Defendant Shop24 Global presented the Plaintiff with the opportunity to switch from a salaried position to an hourly position. Id. at 259–60. Reckner explained that, if the Plaintiff transitioned to an hourly position, he would no longer receive a salary or be considered a manager, his hourly base pay would decrease, and he would be ineligible to receive a bonus. Id. at 259–61. The Plaintiff decided to continue his position as a salaried employee. Id. at 261.

In early September 2012, while still employed by Defendant Shop24 Global, the Plaintiff filed his Complaint (doc. 1) in which he alleged the Defendants violated the FLSA and the Ohio Minimum Fair Wage Standards Act. Around the same time, DefendantShop24 Global hired an additional service technician, Leland Palmer, to keep up with its expanding business. Weygandt Dep. at 32.

Later that September, Weygandt and Palmer traveled to Oklahoma City to install a vending machine. Clark Dep. at 102. Clark traveled to Oklahoma City several days later to assist with the installation. Id. The three men went to dinner together after work. Id. at 103–04. With Palmer's prompting, the Plaintiff described to his co-workers his contentious relationship with Reckner. Id. at 107–09. According to Weygandt, the Plaintiff stated that he was going to try to "oust or overthrow" Defendant Shop24 Global's management, including Reckner. Weygandt Dep. at 36–37. Further, according to Weygandt, the Plaintiff indicated that he would destroy his laptop and other technical documents if Defendant Shop24 Global "trie[d] to do anything to him." Id. Weygandt reported these comments to Reckner. Id. at 40.

After confirming the details of the conversation with Weygandt, Reckner informed Horner, Defendant Shop24 Global's CEO, of the Plaintiff's comments. Horner Dep. at 22, doc. 67-4. Based on the Plaintiff's comments, Horner fired the Plaintiff. Id. at 22–23.

4

The Plaintiff filed his Complaint (doc. 1) on September 4, 2012. The Plaintiff's Third Amended Complaint (doc. 55) alleges multiple violations under the FLSA, 29 U.S.C. § 201, *et seq*., the Ohio Minimum Fair Wage Standards Act, and the Ohio Constitution. Count One alleges that the Defendants misclassified the Plaintiff as an exempt employee and failed to pay him overtime as required by the FLSA. Count Two alleges that the Defendants violated the FLSA when they retaliated against him for engaging in "protected activity" under the FLSA. Count Three alleges that the Defendants failed to pay the Plaintiff overtime wages under § 4111.03 of the Ohio Revised Code, the Ohio Minimum Fair Wage Standards Act. Count Four alleges that the Defendants failed to maintain wage and hour records as required by Article II, Section 34(a) of the Ohio Constitution.

The parties' motions for partial summary judgment are fully briefed and ripe for resolution.

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary material in the record show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Longaberger Co. v. Kolt, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Walton v. Ford Motor Co., 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986); see also Longaberger, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." Daugherty v. Sajar Plastics, Inc., 544 F.3d 696, 702 (6th Cir. 2008) (quoting Anderson, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. Daugherty, 544 F.3d at 702; Adams v. Metiva, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251–52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Eastman Kodak Co. v. Image Technical Servs., Inc., 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." Anderson, 477 U.S. at 252; see Dominguez v. Corr. Med. Servs., 555 F.3d 543, 549 (6th Cir. 2009).

## III.     Discussion

The Plaintiff moves for summary judgment on Counts 1, 3, and 4 of his Third Amended Complaint. According to the Plaintiff, the undisputed facts demonstrate that the Defendants improperly classified him as an exempt employee, which resulted in the denial of overtime compensation to which he was lawfully entitled under the FLSA and the Ohio Revised Code. Further, in the Plaintiff's view, the undisputed facts demonstrate that the Defendants violated Article II, Section 34(a) of the Ohio Constitution because of their failure to maintain proper wage and hours records.

In contrast, the Defendants move for summary judgment on Count II of the Plaintiff's Third Amended Complaint, arguing that the Plaintiff cannot establish causation between his protected conduct and his termination. The Defendants also identify three discrete legal issues to which they believe they are entitled to judgment as a matter of law:

    (1)    That any overtime compensation to which Plaintiff is entitled must be calculated pursuant to the fluctuating workweek a/k/a half-time method;

    (2)    That RDO Equipment Co. was not Plaintiff's "employer" under either the FLSA or Ohio law; and

    (3)    That Shop24 Global, LLC is not liable for any overtime compensation to which Plaintiff is entitled (in the event that he does not qualify as an exempt administrative employee at trial) prior to June 30, 2010 when it acquired the assets of Shop24 USA, Inc. via an Asset Purchase Agreement.

Defs.' Mot. for Partial Summ. J. at 1–2.

The Court addresses each of these issues in turn.

A.    *Count One – FLSA – Unpaid Overtime*

The parties offer competing arguments related to Count One of the Third Amended Complaint. The Plaintiff moves for summary judgment on Count One in its entirety, arguing that

the record demonstrates that he was misclassified as an exempt employee under the FLSA. In contrast, the Defendants maintain that there is a genuine issue of material fact concerning the Plaintiff's classification as an exempt employee. Further, the Defendants argue, if a jury determines that the Plaintiff was misclassified as an exempt employee, any overtime compensation to which the employee is entitled must be calculated pursuant to the fluctuating workweek method.

### 1.    Classification as an Exempt Employee

First, the Plaintiff argues that the Defendants improperly classified him as an exempt employee and failed to pay him overtime compensation to which he was legally entitled. Reviewing the FLSA's categorical exemptions, the Plaintiff contends that the Defendants cannot establish that the administrative, learned professional, or executive exemptions applied to him. In the Plaintiff's view, the evidence establishes that he was a "blue-collar worker" whose primary job function was to service and repair large vending machines. Pl.'s Mot. for Partial Summ. J. at 10.

In response, the Defendants maintain that whether an employee is properly classified as exempt under the FLSA is a highly fact-intensive inquiry. The Defendants emphasize that the record contains significant evidence demonstrating that the Plaintiff's primary job duties were related to the Defendants' management or general business operations, consistent with those of an administrative employee as defined by the FLSA.

"Under the Fair Labor Standards Act . . . , employers must pay their employees . . . overtime for hours worked in excess of forty in a workweek." Misewicz v. City of Memphis, Tenn., 771 F.3d 332, 333–34 (6th Cir. 2014) (citing 29 U.S.C. § 207(a)(1)). Some employees are

not eligible for overtime compensation under the FLSA because they fall within certain exemptions to the FLSA. Little v. Belle Tire Distribs., Inc., — F. App'x —, 2014 WL 5410048, at *2 (6th Cir. Oct. 23, 2014) (per curiam) (citing 29 U.S.C. § 213). Specifically, "section 207 . . . shall not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C. § 213(a)(1). "The decision of whether an employee is exempt from the FLSA's overtime compensation provisions under 29 U.S.C. § 213(a)(1) is primarily a fact question." Schaefer v. Ind. Mich. Power Co., 358 F.3d 394, 407 (6th Cir. 2004) (Suhrheinrich, J., concurring) (citing Ale v. Tenn. Valley Auth., 269 F.3d 680, 688–89, 691 (6th Cir. 2001); Lott v. Howard Wilson Chrysler–Plymouth, Inc., 203 F.3d 326, 330 (5th Cir. 2000)).

Exemptions "are to be narrowly construed against the employers seeking to assert them." Thomas v. Speedway SuperAmerica, LLC, 506 F.3d 496, 501 (6th Cir. 2007). "The employer bears the burden of establishing the affirmative defense by a preponderance of the evidence, and the employer satisfies this burden only by providing 'clear and affirmative evidence that the employee meets every requirement of an exemption.'" Orton v. Johnny's Lunch Franchise, LLC, 668 F.3d 843, 847 (6th Cir. 2012) (quoting Thomas, 506 F.3d at 501). Under this standard, however, the evidentiary burden of summary judgment remains unchanged. Thomas, 506 F.3d at 502.

a.     Administrative Exemption

Under the FLSA, the administrative exemption applies when an employee meets the following factors:

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week . . . ;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a)(1)-(3). It is undisputed that the Plaintiff satisfied the first element of this test. Pl.'s Mot. for Partial Summ. J. at 10. The Plaintiff maintains that he did not satisfy either the second or third element of the administrative exemption.

i.    Office or Nonmanual Work Directly Related to the Management or General Business Operations of the Employer

In analyzing the second element, courts "focus on evidence regarding the actual day-to-day activities of the employee rather than more general job descriptions contained in resumes, position descriptions, and performance evaluations." Schaefer, 358 F.3d at 400 (citing Ale, 269 F.3d at 688–89). Federal regulations provide a number of factors for consideration when determining an employee's primary duty, including:

the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

Id. § 541.700(a). Ultimately, "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." Id.

To satisfy the second element, "an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from

working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. § 541.201(a).[4]

> Work directly related to management or general business operations includes, but is not limited to, work in functional areas such as tax; finance; accounting; budgeting; auditing; insurance; quality control; purchasing; procurement; advertising; marketing; research; safety and health; personnel management; human resources; employee benefits; labor relations; public relations, government relations; computer network, internet and database administration; legal and regulatory compliance; and similar activities.

Id. § 541.201(b).

The record before the Court is mixed and is consistent with the competing accounts offered by the parties. On the one hand, the record reflects that Defendant Shop24 USA hired the Plaintiff as a technician to service and repair the Defendants' vending machines. Reckner Dep. at 9–14. After being hired, the Plaintiff traveled to Europe where he trained extensively in the installation, maintenance, and repair of the Defendants' vending machines. Clark Dep. at 25–27. In his deposition, the Plaintiff testified that he spent a significant portion of his time installing,

---

[4] In interpreting this provision, the Sixth Circuit has recognized an "administrative-production dichotomy, under which production employees (whose job it is to generate the product or service the business offers to the public) will not qualify for the exemption." Foster v. Nationwide Mut. Ins. Co., 710 F.3d 640, 644–45 (6th Cir. 2013) (citing Schaefer, 358 F.3d at 402). In contrast, administrative employees perform work that is "ancillary to an employer's principal production activity." Renfro v. Indiana Mich. Power Co., 370 F.3d 512, 517 (6th Cir. 2004). This dichotomy is not relevant to all cases because "[n]ot all work is classified as either production or administrative." Foster, 710 F.3d at 644.

Here, the parties have briefed the issue of the Plaintiff's classification as an exempt employee without reference to the administrative-production dichotomy or any of its related case law. Instead, the parties have relied on the Code of Federal Regulations and case law applying those regulatory provisions concerning the administrative exemption. In so doing, the parties have not identified the Defendants' "principal production activity." As a result, the administrative-production dichotomy is of limited relevance based on the record before the Court at this time.

Defendant Shop24 Global appears to describe its principal production activity on its website, stating "we provide our Shop 24 automated convenience store" to the customer and will "stock, prep, maintain, and secure it." See The Shop24 Program, http://www.shop24global.com/our-program/ (last visited January 12, 2015). However, this website is not part of the record before the Court. Assuming arguendo that maintaining the vending machines is part of the Defendants' principal production activities, such work could be considered production work. See Foster, 710 F.3d at 644–45 (defining production employees as those employees "whose job it is to generate the product or service the business offers to the public"). However, as will be discussed in greater detail infra, the record is nonetheless mixed and suggests that the Plaintiff performed both production and administrative work. There is a factual dispute concerning which type of work was the Plaintiff's primary duty during his employment with the Defendants.

maintaining, and repairing the vending machines, particularly prior to the hiring of additional technicians. Id. at 63–66, 89.  When not performing manual labor on-site, the Plaintiff would work in the Defendants' shop repairing and rebuilding various components of the vending machines. Id. at 74–75. These facts are consistent with the Plaintiff's position that his primary duty was the performance of manual labor not directly related to the management or general business operations of the Defendant. In this account, the Plaintiff's work involved "repetitive operations with [his] hands, physical skill and energy" based on "skills and knowledge" acquired "through apprenticeships and on-the-job training," 29 C.F.R. § 541.3.

On the other hand, the record includes support for the Defendants' position that the Plaintiff's primary duty was his work as the Defendants' "parts and service manager," taking care of anything to do with "keeping the [vending machines] up and running." Horner Dep. at 9–10. According to Horner, the Plaintiff:

> [w]as responsible for the parts and service aspect of our business. So as part of those duties he would determine what kinds of parts we were going to store, how many of those parts we were going to store, just generally everything and anything to do with the parts and the parts inventory.
> As the service manager, he would have been responsible to determine the service manual warranties, making sure that stores were up, an installation manual . . . handled customer complaints. . . . [L]ater he would have [hired and fired employees]. He would have determined specs for like belts. He would [have] determined specs for the batteries for the stores.
> If there was something going wrong with the stores, he would have figured out what was wrong with the stores and determined a solution. He would have determined a budget for the parts inventory and a budget for service. He would [have] monitored and tracked service calls so that we could determine a good warranty program.

Id. at 10–11.

Further, the Plaintiff interviewed, tested, trained, and supervised the other technicians working for the Defendants. Clark Dep. at 29, 55, 56, 95, 191, 116–117, 223. As the service manager for the Defendants, the Plaintiff provided basic training to customers and responded to

customers' requests for service. Id. at 65–66. On some occasions, the Plaintiff helped customers resolve issues with the vending machines over the phone. Id. at 73–74. On other occasions, the Defendants hired sub-contractors to service their vending machines rather than incur the costs associated with the Plaintiff traveling to the customer's location and servicing the machines on-site. Id. at 87–89. The Plaintiff would provide those sub-contractors with instructions by phone on how to service the vending machines. Id.

In this account of the facts, the Plaintiff frequently performed the work of an administrative employee. The Plaintiff procured and maintained the inventory of parts for the vending machines; determined a budget for the parts inventory and for servicing the vending machines; and interviewed, tested, trained, and supervised the other technicians working for the Defendants. See 29 C.F.R. § 541.201(b) ("Work directly related to management or general business operations includes . . . accounting, budgeting, . . . purchasing, procuring, . . . [and] personnel management").

The Defendants characterize much of the Plaintiff's work as service manager as "quality control," which federal regulations consider to be "[w]ork directly related to management or general business operations," 29 C.F.R. § 541.201. Defs.' Resp. in Opp. at 9–11, doc. 82. The Plaintiff vigorously contests this characterization. See Pl.'s Reply at 6–8, doc. 83. The parties' dispute over "quality control" misses the forest for the trees. The ultimate issue is whether the Plaintiff "perform[ed] work directly related to assisting with the running or servicing of the [Defendants'] business." 29 C.F.R. § 541.201(a). To aid in a determination of whether requirement is satisfied, federal regulations provide a *nonexhaustive* list of work, including quality control, which is directly related to management or general business operations. See id. § 541.201(b). In the Defendants' version of events, the Plaintiff's responsibility for customer

service—providing basic training to customers, remotely developing solutions to problems with the vending machines, and directing the implementation of those solutions—was essential to the running of their business. However his work is categorized, the Defendants' have presented sufficient evidence to support the conclusion that the Plaintiff's work as service manager was integral to "the running or servicing of the [Defendants'] business," id. § 541.201(a).

The record does not support summary judgment in favor of the Plaintiff on Count One. While the Plaintiff certainly devoted considerable time to installing, repairing, and maintaining the Defendants' vending machines, the record also contains evidence that the Plaintiff devoted significant time to the performance of office or non-manual work directly related to the management or general business operations of the Defendants or the Defendants' customers. In short, there is a genuine issue of fact concerning the second element of the administrative employee exemption that a jury, and not the Court, must resolve.

The Plaintiff argues that Bothell v. Phase Metrics, Inc., 299 F.3d 1120 (9th Cir. 2002) compels a different result. In Bothell, the defendant produced and sold "robotic test and inspection equipment for the data storage industry." 299 F.3d at 1122. Although initially an hourly, non-exempt, contract employee, the plaintiff was offered a position as a field service engineer. Id. at 1123. Upon accepting the position as a field service engineer, the plaintiff's work responsibilities did not change, but he became a salaried employee and was considered to be exempt from the FLSA overtime provisions. Id. As a field service engineer, the plaintiff traveled to a client's facility where he spent most of his time. Id. The plaintiff returned to the defendant's office "two or three times a week to do paperwork, meet with his supervisors, review new products, and/or pick up supplies." Id.

The parties offered competing accounts concerning the plaintiff's primary duty. The defendant maintained that the plaintiff was their representative to the client and that the plaintiff individually managed the client's customer account. Id. According to the defendant, as part of the plaintiff's responsibilities, he supervised the installation, repair, and maintenance of the defendant's equipment. Bothell, 200 F.3d at 1123.

In contrast, the plaintiff asserted that his primary duty was to "install, troubleshoot, and maintain" the defendant's equipment. Id. at 1124. He testified that:

> over a fifty-two week period, he worked with crews to install ten machines, each of which took approximately two weeks: installations, including the paperwork and customer contacts directly associated with those installations, took up approximately 40% of his time. In addition, [he] spent additional time troubleshooting and maintaining the existing machines. The remainder of his time was spent responding to customer calls, learning about systems and procedures, and completing the paperwork required by [the defendant].

Id.

Despite these conflicting accounts, the district court granted judgment in favor of the defendant, finding that the plaintiff satisfied the criteria for the administrative employee exemption. Id. at 1122. In so holding, the district court relied on its finding that the plaintiff's customer service work was "ancillary" to the defendant's main activities, and therefore, was administrative in nature. Id. at 1126. The Ninth Circuit reversed, observing that "[w]ork relating to customer service of products sold is not necessarily 'administrative' work." Id. The court continued, explaining:

> [the defendant] does exist to design, manufacture, and sell test equipment. But, as [the defendant] acknowledges, its equipment is "technologically advanced." Customers require installation, training, and service assistance in order successfully to operate the equipment and are unlikely to buy such equipment unless there is such assistance. Customer service activities, therefore, go to the heart of [the defendant's] marketplace offerings, not to the internal administration of [the defendant's] business (or that of its customers).

Bothell, 200 F.3d at 1126.

Reviewing the parties' competing factual accounts, the court identified two plausible narratives. Id. at 1128. On one hand, if uncontradicted, the defendant's evidence indicated that the plaintiff was an account manager responsible for staffing, supervision, and billing whose manual labor related to maintaining the defendant's equipment was insignificant relative to his administrative tasks. Id. On the other hand, if uncontradicted, the plaintiff's evidence demonstrated that he was a highly-skilled repairmen assigned to a client to ensure the installation and maintenance of the defendant's machines with any administrative work being incidental to his manual labor. Id. Consequently, the court of appeals concluded that a fact-specific inquiry was necessary to resolve the issue of the plaintiff's administrative exemption.

The Plaintiff emphasizes the factual similarities between Bothell and the present case, stating "[s]imilarly to Clark, the plaintiff in Bothell spent his time installing new equipment, repairing, and maintaining existing machines, responding to customer calls, and completing paperwork." Pl.'s Mot. for Partial Summ. J. at 13. However, the Plaintiff argues, unlike Bothell, the record in the present case does not contain evidence that would support a finding that his primary duty involved the performance of administrative work. Pl.'s Reply at 3. As discussed above, the Court disagrees with this characterization of the record. The evidence presented by the Defendant demonstrates that the Plaintiff's work included activities such as accounting, budgeting, purchasing, procuring, and personnel management, all of which are considered non-manual work directly related to management or general business operation. See 29 C.F.R. § 541.201(b). As in Bothell, a factual dispute concerning the Plaintiff's primary duty is present in the instant case. Therefore, judgment in favor of either party is inappropriate at this stage of the proceedings.

ii.     Discretion and Independent Judgment

The third element of the administrative exemption test is whether an employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). Federal regulations provide guidance concerning what constitutes "discretion and independent judgment." See id. § 541.202. "In general, the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after the various possibilities have been considered." Id. § 541.202(a). "The exercise of discretion and independent judgment implies that the employee has authority to make an independent choice, free from immediate direction or supervision. However, employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level." Id. § 541.202(c). "The exercise of discretion and independent judgment must be more than the use of skill in applying well-established techniques, procedures or specific standards described in manuals or other sources." Id. § 541.202(e).

As with the second element, the record concerning the third element is mixed. The Plaintiff argues that when performing his primary duties as a repairman, he did not exercise discretion and independent judgment on matters of significance. In his account, his primary duty as a repairman involved "applying well-established techniques [and] procedures," id., that he learned from his training in Belgium and previous employment, Clark Dep. at 25–27. Further, in much of his work he was subject to "immediate direction or supervision," 29 C.F.R. § 541.202(c).  For example, the Plaintiff was required to seek authorization from Reckner before traveling to repair a vending machine on-site. Clark Dep. at 194–95. He also required Reckner's

17

approval before placing an order for parts necessary to repair and maintain the vending machines. Id. at 219.

The Defendants cite evidence to the contrary. In their version of events, the Plaintiff: helped develop the Defendants' service contracts, id. at 44–45, 178, 246–47; selected a parts supplier and stocked an inventory of parts estimated to be worth $50,000 to $60,000, id. at 46–47, 165, 166–67; determined the type of response necessary to resolve maintenance problems with the vending machines, id. at 91–94; negotiated with subcontractors regarding the types of services they would provide, id. at 184–86; approved payment of invoices, Clark Dep. at 215–17, 249, 253; provided input and analysis in developing the operator's guide for the vending machines, id. at 121–22; and developed a test to evaluate applicants for technician positions, id. at 209–10.

Federal regulations identify a number of factors to consider when determining whether an employee exercises discretion and independent judgment with respect to matters of significance. See 29 C.F.R. § 541.202(b). As a general matter, the Plaintiff's responsibility as the parts and service manager for the Defendants could be considered "work that affect[ed] business operations to a substantial degree, even if the [Plaintiff's] assignments [were] related to operation of a particular segment of the business," id. The specific facts identified by the Defendant are also consistent with other factors under 29 C.F.R. § 541.202(b). The Plaintiff "provide[d] consultation or expert advice to management," id., when he helped the Defendants develop their service contracts. He "carrie[d] out major assignments in conducting the operations of the business" and "committed the [Defendants] in matters that ha[d] significant financial impact," id., when he selected a parts supplier and stocked an inventory of parts estimated to be worth $50,000 to $60,000. Further he had the authority to "formulate" or "affect . . . management

policies or operating practices," id., when he provided input and analysis in developing the operator's guide for the vending machines and developed a test to evaluate applicants for technician positions.

In some instances, the Plaintiff "ha[d] the authority to make an independent choice, free from immediate direction or supervision," id. § 541.202(c). The Plaintiff chose the part supplier without immediate direction or supervision. Clark Dep. at 46–47. He had discretion to choose the parts to buy for the Defendants' inventory, subject to financial approval from management for particularly expensive items. Id. at 166–67. Further, he had the authority to respond to customers' requests for service and to independently devise and implement solutions to customers' problems. Id. at 91–94.

In light of the foregoing, the Court concludes that the Defendants have presented sufficient evidence to demonstrate a genuine issue of material fact as to whether the Plaintiff's "primary duty include[d] the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. § 541.200(a)(3). The Court will therefore deny the Plaintiff's motion for summary judgment as to Count One of the Third Amended Complaint.[5]

b.      Executive Exemption

The parties offer limited briefing on this issue. The Defendants maintain that the Plaintiff qualified for the executive exception for the last month of his employment with Defendant Shop24 Global in September 2012. The Plaintiff argues that he did not satisfy the executive

---

[5] The Plaintiff maintains that: (1) he can recover damages based on a three-year statute of limitations because the Defendants' alleged violation of the FLSA was knowing and willful; and (2) he is entitled to liquidated damages because the Defendants cannot demonstrate that their alleged violation of the FLSA was in good faith and was reasonable. Pl.'s Mot. for Partial Summ. J. at 23–26. Because the Court concludes that there is a genuine issue of material fact as to whether the Defendants properly classified the Plaintiff as an exempt employee, the Court does not address those issues here.

exception because he did not customarily and regularly direct the work of two or more other employees. In response, the Defendants assert that, during the month of September 2012, Weygandt and Parker reported to the Plaintiff on a daily basis.

Under the FLSA, an employee employed in a bona fide executive capacity is defined as any employee:

> (1) Compensated on a salary basis at a rate of not less than $455 per week . . . ;
>
> (2) Whose primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof;
>
> (3) Who customarily and regularly directs the work of two or more other employees; and
>
> (4) Who has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight.

29 C.F.R. § 541.100(a). Here, the Plaintiff contends that he did not satisfy the third element of this definition.[6]

The record includes contradictory testimony regarding the Plaintiff's authority over Weygandt and Parker. According to the Plaintiff, he had little, if any, ability to direct the work of Weygandt and Parker. See Clark Dep. at 30–31, 39–40, 51, 94–96, 242 (testifying that Weygandt reported to Reckner; the Plaintiff had no ability to direct Weygandt's work; the Plaintiff did not

---

[6] In his reply, the Plaintiff briefly argues that he did not satisfy the second element of this definition. See Pl.'s Reply at 12 ("As set forth in detail above, there is no genuine dispute regarding Clark's primary job duties. . . . His primary duty was not management of the enterprise in which Defendants are employed or of a customarily recognized department or subdivision thereof.") However, in his initial motion for summary judgment, he relied solely on the third element as the basis for challenging his classification as an executive employee. See Pl.'s Mot. for Partial Summ. J. at 18–19 (stating "[a]n assertion that Clark fell under the executive exemption in September 2012 fails as a matter of law because Clark did not 'customarily and regularly direct[] the work of two or more other employees,'" and making no reference to the second element of the definition of an executive employee.). A movant cannot raise new issues for the first time in a reply brief because consideration of such issues "deprives the non-moving party of its opportunity to address the new arguments." Cooper v. Shelby Cnty., No. 07–2283–STA–cgc, 2010 WL 3211677, at *3 n. 14 (W.D. Tenn. Aug. 10, 2010) (collecting Sixth Circuit and district court cases discussing this principle); see also Scottsdale Ins. Co. v. Flowers, 513 F.3d 546, 553 (6th Cir. 2008) (noting that a party waives an issue raised for the first time in a reply brief). The Court therefore declines to consider the Plaintiff's argument with respect to the second element as a basis for granting his motion.

have authority to discipline Weygandt); id. at 102–03 (testifying that Parker worked on installing vending machines at the direction of Reckner, not the Plaintiff). However, the record also includes testimony that Weygandt and Parker reported to the Plaintiff on a regular basis. Palmer Dep. at 10–11, doc. 72-6; Weygandt Dep. at 11–13, doc. 67-5. At the Plaintiff's deposition, the Defendants presented Palmer's hiring paperwork which listed the Plaintiff as Palmer's supervisor. Clark Dep. at 320–21, Ex. 69. In short, these competing factual narratives create a genuine issue of material fact as to whether the Plaintiff customarily and regularly directed the work of Weygandt and Parker. This is a classic factual dispute that a jury must resolve at trial. Consequently, the Court will deny the Plaintiff's Motion for Partial Summary Judgment as to the issue of the Plaintiff's classification as a bona fide executive employee for the month of September 2012.

### 2.     Fluctuating Workweek and Overtime Compensation

The Defendants argues that, in the event a jury finds that the Plaintiff did not qualify for the administrative or executive exemption, any overtime compensation to which the Plaintiff is entitled to under the FLSA should be calculated pursuant to the fluctuating workweek (FWW) method. In support of their argument, the Defendants cite Overnight Motor Transp. Co. v. Missel, 316 U.S. 572 (1942), superseded on other grounds by statute as stated in Trans World Airlines, Inc. v. Thurston, 469 U.S. 111, 128 n. 22 (1985), which, in their view, authorizes payment of half-time compensation for all hours worked in excess of 40 hours per week. The Defendants insist that this half-time method of compensation, rather than a rate of one and a half time, should determine the amount of any overtime compensation to which the Plaintiff is entitled.

The Plaintiff rejects the Defendants' approach, arguing that he is entitled to overtime compensation calculated at a rate of one and one-half times his regular rate of pay as set forth in 29 U.S.C § 207. In the Plaintiff's view, 29 C.F.R. § 778.114 sets forth the conditions that must be satisfied in order for an employer to calculate overtime compensation by the FWW method. Because the Defendants cannot establish that all of those conditions were met, the Plaintiff contends that the Defendants are not entitled to summary judgment on this issue.

In reply, the Defendants assert that the Plaintiff's response "ignores the legal basis" for their argument. Defs.' Reply at 5, doc. 76. Drawing the Court's attention to their initial motion for partial summary judgment, the Defendants maintain that Overnight Motor Transp. Co. v. Missel, rather than 29 C.F.R. § 778.114, is the basis of their argument for the application of the FWW method. In their view, Missel authorizes the calculation of overtime compensation in accordance with the FWW method, independent of 29 C.F.R. § 778.114.

The FLSA provides "time and pay requirements for all employees engaged in interstate commerce." Mitchell v. Abercrombie & Fitch, Co., 428 F. Supp. 2d 725, 732 (S.D. Ohio 2006) aff'd, 225 F. App'x 362 (6th Cir. 2007). It mandates, *inter alia*, that:

> no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times *the regular rate* at which he is employed.

29 U.S.C. § 207(a)(1) (emphasis added). The FLSA does not define the term "regular rate." Mitchell, 428 F. Supp. 2d at 732. However, federal regulations explain that "[t]he 'regular rate' under the Act is a rate per hour and that "[t]he regular hourly rate of pay of an employee is determined by dividing his total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked by him in that workweek for which such compensation was paid." 29 C.F.R. § 778.109.

In <u>Missel</u>, the Supreme Court interpreted 29 U.S.C. § 207(a)(1) and approved the FWW as an alternative method for calculating an employee's overtime compensation when the employee's "contract is for a weekly wage with variable or fluctuating hours." 316 U.S. at 580. Under <u>Missel</u>, "when an employee is, by agreement, paid a fixed weekly wage for hours that fluctuate from week to week, the proper way to calculate the employee's regular rate of pay is to divide the weekly wage by the number of hours actually worked in a particular week." <u>Urnikis-Negro v. Am. Family Prop. Servs.</u>, 616 F.3d 665, 674 (7th Cir. 2010) (citing <u>Missel</u>, 316 U.S. at 580). This approach "treats the fixed weekly wage paid to the employee as compensation at the regular rate for all hours that the employee works in a week, including overtime hours." <u>Urnikis-Negro</u>, 616 F.3d at 674. As a result:

> [t]he employer will separately owe the employee a premium for the overtime hours, but because he has already been compensated at the regular rate for the overtime hours by means of the fixed wage, the employer will owe him only one-half of the regular rate for those hours rather than time plus one-half.

<u>Id</u>.

The FWW method of calculating overtime compensation has been incorporated into the Code of Federal Regulations. <u>See</u> 29 C.F.R. § 778.114. The regulation provides:

> An employee employed on a salary basis may have hours of work which fluctuate from week to week and the salary may be paid him pursuant to an understanding with his employer that he will receive such fixed amount as straight time pay for whatever hours he is called upon to work in a workweek, whether few or many. Where there is a clear mutual understanding of the parties that the fixed salary is compensation (apart from overtime premiums) for the hours worked each workweek, whatever their number, rather than for working 40 hours or some other fixed weekly work period, such a salary arrangement is permitted by the Act if the amount of the salary is sufficient to provide compensation to the employee at a rate not less than the applicable minimum wage rate for every hour worked in those workweeks in which the number of hours he works is greatest, and if he receives extra compensation, in addition to such salary, for all overtime hours worked at a rate not less than one-half his regular rate of pay. Since the salary in such a situation is intended to compensate the employee at straight time rates for whatever hours are worked in the workweek, the regular rate of the employee will

vary from week to week and is determined by dividing the number of hours worked in the workweek into the amount of the salary to obtain the applicable hourly rate for the week. Payment for overtime hours at one-half such rate in addition to the salary satisfies the overtime pay requirement because such hours have already been compensated at the straight time regular rate, under the salary arrangement.

Id. § 778.114(a).

Courts have struggled with the application of the FWW method when calculating overtime compensation in FLSA misclassification cases. Three distinct approaches are apparent from a review of the case law. Some district courts have concluded that the FWW should not be applied in a misclassification case under the FLSA. O'Neill v. Mermaid Touring Inc., 968 F. Supp. 2d 572, 585 (S.D.N.Y. 2013) (collecting cases). Other courts have relied on 29 C.F.R. § 778.114(a) as a basis for applying the FWW method to calculate remedial overtime compensation in misclassification cases. See Clements v. Serco, Inc., 530 F.3d 1224, 1230–31 (10th Cir. 2008); Valerio v. Putnam Assocs., 173 F.3d 35, 39–40 (1st Cir. 1999); Blackmon v. Brookshire Grocery Co., 835 F.2d 1135, 1138–39 (5th Cir. 1988). More recently, another group of appellate courts has found that 29 C.F.R. § 778.114(a) does not authorize remedial damages and that Missel itself provides the authority for applying the FWW method in misclassification cases. See Black v. SettlePou, P.C., 732 F.3d 492, 497–98 (5th Cir. 2013); Ransom v. M. Patel Enterprises, Inc., 734 F.3d 377, 384–86 (5th Cir. 2013); Lamonica v. Safe Hurricane Shutters, Inc., 711 F.3d 1299, 1311 (11th Cir. 2013); Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 357 (4th Cir. 2011); Urnikis–Negro, 616 F.3d at 666.

Notably absent above is any case from the Sixth Circuit Court of Appeals. One district court has observed that "[t]here is no Sixth Circuit precedent controlling the calculation of damages in FLSA misclassification cases." Arrington v. Michigan Bell Tel. Co., No. 10-10975,

2012 WL 4868225, at *2 (E.D. Mich. Oct. 15, 2012).[7] The Defendants here have invoked Missel as the basis for applying the FWW method in calculating any overtime compensation to which the Plaintiff may be entitled. Under Missel, the FWW method of retroactively calculating overtime compensation is permitted when an employer and employee agree that the employee will receive a fixed weekly wage to work fluctuating work hours. Black, 732 F.3d at 499 (citing Missel, 316 U.S. at 580); Lamonica, 711 F.3d at 1310–11 (citing Missel, 316 U.S. at 580); Desmond, 630 F.3d at 357 (Missel, 316 U.S. at 580); Urnikis–Negro, 616 F.3d at 674 (citing Missel, 316 U.S. at 580). "The question of whether an employer and employee agreed to a fixed weekly wage for fluctuating hours is a question of fact." Black, 732 F.3d at 498 (citing Ransom, 734 F.3d at 381).

Here, the Defendants argue that the record demonstrates that the Plaintiff agreed to a fixed weekly salary as compensation for fluctuating work hours. To support their argument, the Defendants cite the Plaintiff's deposition at which he testified that his average work week was 70 hours, but that some weeks he worked 100 hours, up to 18 hours a day, Clark Dep. at 125. Further, the Defendants note, the Plaintiff received the Shop24 Employee Handbook, id. at 196, which stated:

> The normal work day is eight (8) hours, and forty (40) hours represents a normal work week . . . . While you are generally expected to work the number of hours stated above, Company does not guarantee that you will actually be able to

---

[7] Nonetheless, the Defendants argue that Fegley v. Higgins, 19 F.3d 1126 (6th Cir. 1994) supports their position that the FWW method of calculating overtime compensation should be applied in this case if the jury finds that the Plaintiff was misclassified as an exempt employee. The Court disagrees. Fegley did not concern an allegedly misclassified employee like the Plaintiff here, and the court did not discuss Missel or 29 C.F.R. § 778.114. Moreover, the appellate panel quoted the factual findings of the district court, which demonstrated that the district court applied a different method than the FWW method in calculating the plaintiff's overtime pay. See Fegley, 19 F.3d at 1130 (awarding less than half time the plaintiff's regular rate of pay for overtime compensation). Neither party challenged the district court's calculation, and, as a result, the appellate panel did not consider the district court's method of calculation. Id.

The Sixth Circuit has affirmed the use of the FWW method for compensating employees for overtime pursuant to 29 C.F.R. § 778.114(a), Mitchell v. Abercrombie & Fitch, Co., 225 F. App'x 362 (6th Cir. 2007) (per curiam); Highlander v. K.F.C. Nat'l Mgmt. Co., 805 F.2d 644, 647–48 (6th Cir. 1986), but has not addressed its use when retroactively calculating overtime compensation for misclassified employees under the FLSA.

perform all of your work duties in this amount of time. You are expected to put in the amount of time over 40 hours per week necessary to complete your job duties and occasionally, in rare circumstances, substantial extra work will be required. If you are overburdened with work and unable to complete your assignments with a moderate amount of additional work each week, please speak to your supervisor; however, with more responsibility and increased pay, usually comes a greater work load and more time spent working.

Exempt employees are not paid overtime for hours worked above 40 hours per week; a moderate amount of expected overtime is built into your compensation package as a salaried employee.

Def.'s Manual at 8–9. Finally, the Defendants point to the Plaintiff's deposition as evidence that

he understood his fixed weekly salary was his compensation for working fluctuating hours:

| Defs.' Counsel: | And the entire duration of your employment you were on a salary the entire time? |
| Plaintiff: | Yes. |
| Defs.' Counsel: | And you knew that was going to be the amount of money that you receive, you weren't going to get any overtime compensation? |
| Plaintiff: | That's the way the conversations were then, yes. |

Clark Dep. at 307.

Curiously, the Plaintiff devotes his response to addressing 29 C.F.R. § 778.114(a) rather

than Missel, the authority on which the Defendants rely. However, similar to Missel, one of §

778.114(a)'s requirements for the application of the FWW method is that the employer and

employee must share a "clear mutual understanding" that the employer will pay the employee a

fixed salary regardless of the number of hours worked. In the body of his response, the Plaintiff

appears to concede that he and the Defendants agreed to a fixed weekly salary as compensation

for him working fluctuating hours. See Pl.'s Resp. at 28–29.[8] Under Missel, this concession

---

[8] Citing Rainey v. American Forest and Paper Association, 26 F. Supp. 2d 82, 100 (D.D.C. 1998), the Plaintiff asserts that there are five criterion that must be satisfied in order to apply the FFW method for calculating overtime compensation under § 778.114(a):

would permit the application of the FWW for purposes of calculating any overtime compensation to which the Plaintiff is entitled. See Urnikis–Negro, 616 F.3d at 674 (citing Missel, 316 U.S. at 580). However, in a footnote, the Plaintiff contests the Defendants' assertion that he knew that his salary was the entire compensation that he was going to receive from Shop24 for his services:

> Clark's [sic] testified that he was not aware of how he should be paid. For example, Clark inquired as to whether he would be receiving overtime pay following a service trip, during which both Clark and Reckner worked long hours. (Pl. Dep. at 337). Clark also testified that he was "constantly being promised" bonuses from Defendants. (Pl. Dep. at 125; Reckner Dep. at 48-49).

Pl.'s Resp. at 30 n.7. The Court must determine whether these facts are sufficient to create a genuine issue of material fact as to whether the parties agreed that the Plaintiff would receive a fixed weekly wage to work fluctuating hours.

To determine whether the parties agreed that the Plaintiff would receive a fixed weekly wage to work fluctuating work hours, courts look to the parties' initial understanding of the employment agreement and the parties' course of conduct. Black 732 F.3d at 499–501; Ransom, 734 F.3d at 386; see also Urnikis–Negro, 616 F.3d at 681 n.8 (collecting cases suggesting that, in

---

1) there must be a clear mutual understanding between the parties;

2) the employee's hours must fluctuate from week to week;

3) the employee must receive the same fixed salary regardless of the number of hours she worked during a particular week;

4) the salary must be sufficient to provide an average hourly compensation of more than the minimum wage; and

5) the employee must receive extra compensation, in addition to such salary, for all overtime hours worked.

The Plaintiff argues that the fifth element has not been satisfied in this case, implicitly conceding that the other four elements have been met. See Pl.'s Resp. at 29 ("Here, the fluctuating workweek does not apply because requirement (5) is not satisfied").

27

the absence of an explicit agreement, course of conduct may be used to infer an agreement regarding the number of hours a salary was intended to compensate). The parties have not presented the Court with an explicit employment agreement. The record concerning the parties' course of conduct demonstrates that the Plaintiff worked fluctuating hours. However, there is a genuine issue of material fact as to whether the parties' agreed that a fixed weekly wage alone would compensate the Plaintiff for those fluctuating hours. The Plaintiff's testimony and the Defendants' Employee Handbook could be viewed to support the existence of such an agreement. In contrast, the evidence cited by the Plaintiff indicates that he questioned the Defendants why he did not receive overtime and that the Defendants promised him payment in the form of bonuses for his work. Such evidence is inconsistent with an agreement between the parties for a fixed weekly wage as compensation for fluctuating work hours.

Urnikis-Negro and Black are instructive here. In Urnikis-Negro, the employee worked fluctuating hours, accepted her fixed weekly pay without protest, and never requested overtime compensation. 616 F.3d at 669. Because of this course of conduct, the court permitted the use of the FWW method for calculating overtime compensation. Id. In contrast, in Black, the employee "immediately and repeatedly" voiced her disagreement with her lack of overtime pay upon being reclassified as an exempt employee. 732 F.3d at 501. Such conduct, in the court's view, demonstrated "that [the employee] did not agree that her fixed weekly salary should compensate her for all of the hours she worked each week." Id. Consequently, the court of appeals reversed the district court's application of the FWW method when calculating the remedial overtime compensation to which the plaintiff was entitled. Id.

The present case falls between these two cases but is sufficiently similar to Black to justify denying the Defendants' request for summary judgment as to the method for calculating

any overtime compensation to which the Plaintiff may be entitled. Like the employee in <u>Black</u>, the Plaintiff here repeatedly questioned his employer's failure to pay him overtime. In addition, according to the Plaintiff, the Defendants promised him bonuses for his work, conduct inconsistent with an agreement between the parties for a fixed weekly wage as compensation for fluctuating work hours. The Court will deny the Defendants' request for summary judgment accordingly.

B.    *Count Two – FLSA – Retaliation*

In Count Two of his Third Amended Complaint, the Plaintiff asserts that the Defendants terminated him for questioning them regarding his right to overtime compensation and for filing the instant action. The Defendants maintain that they are entitled to summary judgment as to this Count. They acknowledge that the FLSA prohibits firing or discriminating against any employee that exercises his rights under the FLSA, but maintain that the Plaintiff cannot establish a causal connection between his protected conduct and his termination. Moreover, the Defendants contend that, even if such a causal connection is demonstrated, they terminated the Plaintiff for a legitimate business reason. The Plaintiff disagrees, asserting that he can establish all elements of a prima facie case of retaliation and prove that any non-retaliatory reason proffered by the Defendants for his termination is pretextual.

The FLSA's retaliation provision states in relevant part that it shall be unlawful "to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter[.]" 29 U.S.C. § 215(a)(3). <u>McDonnell Douglas Corp. v. Green</u>'s burden-shifting analysis

applies to claims of retaliation under the FLSA. Adair v. Charter County of Wayne, 452 F.3d 482, 489 (6th Cir. 2006) (citing Moore v. Freeman, 355 F.3d 558, 562 (6th Cir. 2004)).

> To establish a prima facie case of retaliation, an employee must prove that (1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known to the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action.

Adair, 452 F.3d at 489 (citing Williams v. Gen. Motor Corp., 187 F.3d 553, 568 (6th Cir. 1999)). If a plaintiff successfully establishes a prima facie case of retaliation, the burden shifts to set the defendant to "to set forth a legitimate, non-discriminatory reason for the adverse employment action." Adair, 452 F.3d at 489 (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). "If the defendant carries this burden, the plaintiff then must prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but merely a pretext for illegal discrimination." Adair, 452 F.3d at 489 (citing Kocsis v. Multi-Care Mgmt., Inc., 97 F.3d 876, 883 (6th Cir. 1996)).

### 1.    Causal Connection

Here, the parties dispute the fourth element of the Plaintiff's prima facie case of retaliation. The Defendants emphasize that the Plaintiff first engaged in protected action in July 2009 when he complained of his lack of overtime to Reckner but was not terminated until September 2012, more than three years after he engaged in protected activity. Given this lack of temporal proximity, the Defendants maintain that the Plaintiff cannot establish a causal connection between his protected activity and his termination.

In response, the Plaintiff draws the Court to a different protected activity—the filing of the instant Complaint seeking unpaid overtime under the FLSA on September 4, 2012. The

30

Plaintiff stresses that he was fired three weeks after filing the Complaint in the instant case. In his view, the temporal proximity between the filing of the Complaint and his termination is sufficient to establish a causal connection between the two.

"In order to establish a causal connection between the protected conduct and the adverse action, plaintiff must produce enough evidence of a retaliatory motive such that a reasonable juror could conclude that the [adverse employment action] would not have occurred but for his engagement in protected activity." Eckerman v. Tenn. Dep't of Safety, 636 F.3d 202, 209 (6th Cir. 2010). A causal link can be shown through direct or circumstantial evidence. Dye v. Office of the Racing Comm'n, 702 F.3d 286, 305 (6th Cir. 2012). The Sixth Circuit has recognized that, in some cases, temporal proximity alone between the protected activity and the adverse employment action may be sufficient to establish a causal connection in a retaliation case. Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 523–26 (6th Cir. 2008).[9]

---

[9] One line of Sixth Circuit cases tracing to Nguyen v. City of Cleveland, 229 F.3d 559 (6th Cir. 2000) holds that temporal proximity alone is insufficient to establish a causal connection for a retaliation claim. See, e.g., Tuttle v. Metro. Gov't of Nashville, 474 F.3d 307, 321 (6th Cir. 2007); Adair, 452 F.3d at 490–91. The court in Mickey examined Sixth Circuit precedent and rejected this reading of Nguyen, holding that:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

516 F.3d at 525. Despite this seemingly clear statement of law, some subsequent Sixth Circuit panels have adhered to the rule that temporal proximity alone is insufficient to establish a causal connection for a retaliation claim. See, e.g., Pettit v. Steppingstone, Ctr. for the Potentially Gifted, 429 F. App'x 524, 533 (6th Cir. 2011); Spengler v. Worthington Cylinders, 615 F.3d 481, 494 (6th Cir. 2010).

Here, the Defendants do not rely on these cases when arguing a lack of causal connection between the filing of the instant case and the Plaintiff's termination. Moreover, the most recent Sixth Circuit panels to have considered the issue have analyzed the issue of causal connection consistent with the court's holding in Mickey. See, e.g., Weeks v. Mich., Dep't of Cmty. Health, — F. App'x —, 2014 WL 4922269, at *9 (6th Cir. Oct. 1, 2014); Montell v. Diversified Clinical Servs., 757 F.3d 497, 505 (6th Cir. 2014).

Here, the Plaintiff was terminated by the Defendants three weeks after the filing of the Complaint in this case. This close temporal proximity between the Plaintiff's protected activity and the adverse employment action is sufficient evidence such that a reasonable juror could conclude that the adverse employment action would not have occurred but for his engagement in protected activity. See Dixon v. Gonzales, 481 F.3d 324, 334 (6th Cir. 2007) ("This Court typically [has] found the causal connection element [is] satisfied only where the adverse employment action occurred within a matter of months, or less, of the protected activity"); see also Herrera v. Churchill McGee, LLC, 545 F. App'x 499, 501 (6th Cir. 2013) (holding that a temporal proximity of one month between the plaintiff's protected activity and adverse employment action was sufficient to establish a causal connection); Shefferly v. Health Alliance Plan of Mich., 94 F. App'x 275, 285 (6th Cir. 2004) ("[T]he passage of less than three weeks between [the employer's] receipt of the charges and the adverse actions gives rise to an inference of discrimination"); DiCarlo v. Potter, 358 F.3d 408, 421–22 (6th Cir. 2004) (holding that the passage of only twenty-one days between the plaintiff's filing of an EEOC charge and his termination gave rise to an inference of a causal connection between the two events sufficient to establish a *prima facie* case of retaliation); but see Philbrick v. Holder, 583 F. App'x 478, 490 (6th Cir. 2014) (holding that five weeks between protected activity and adverse employment action insufficient to establish a causal connection). Therefore, the Plaintiff has presented sufficient facts to establish a causal connection between the filing of the Complaint in this case and his subsequent termination.

2.  Pretext

The Defendants also argue that, even if the Plaintiff can establish a prima facie case of retaliation, he was terminated for a legitimate, non-discriminatory reason. They argue that the Plaintiff was fired for his insubordinate and threatening behavior at dinner with Weygandt and Parker in Oklahoma City in September 2012. In the Defendants' view, the Plaintiff cannot establish that their stated reason for terminating the Plaintiff's employment was pretextual.

The Plaintiff contends that the Defendants' stated reason for firing him did not actually motivate their decision to terminate his employment. According to the Plaintiff, the Defendants seized on the Plaintiff's comments at the dinner in Oklahoma City as a cover for their true reason for firing the Plaintiff—to punish the Plaintiff for his ongoing complaints about his lack of overtime compensation and the filing of the instant lawsuit. The Plaintiff emphasizes that the temporal proximity between the filing of the instant lawsuit and his termination further supports the conclusion that the Defendants' decision to terminate his employment based on his conduct at the dinner in Oklahoma City was pretextual in nature.

Here, the evidence presented by the Defendants indicates that the Plaintiff's behavior at the dinner with Weygandt and Parker in Oklahoma City in September 2012 was insubordinate and unprofessional. At the dinner, the Plaintiff described his contentious relationship with Reckner to his co-workers. Clark Dep. at 107–09. The Plaintiff stated that he was going to try to "oust or overthrow" Defendant Shop24 Global's management, including Reckner. Weygandt Dep. at 36–37. Further, the Plaintiff indicated that he would destroy his laptop and other technical documents if Defendant Shop24 Global "trie[d] to do anything to him." Id. Weygandt reported these comments to Reckner. Id. at 40. Reckner informed Honer, Defendant Shop24 Global's CEO, of the Plaintiff's behavior. Honer Dep. at 23. Honer corroborated this account with Weygandt directly. Id. at 24–25. After consulting with legal counsel, Honer made the decision to

suspend the Plaintiff and then fire him based on his conduct at that dinner. Id. at 22, 25–28. The Court has no trouble concluding that this insubordinate and unprofessional behavior constituted a legitimate, non-discriminatory reason for terminating the Plaintiff's employment. See Franks v. Vill. of Bolivar, 583 F. App'x 534 (6th Cir. 2014) (employee's insubordination and lack of professionalism were legitimate non-discriminatory for terminating his employment); Fullen v. City of Columbus, 514 F. App'x 601, 606 (6th Cir. 2013) ("We have repeatedly held that insubordination may constitute a legitimate, nondiscriminatory reason for adverse action." (citations omitted)).

Once the defendant provides a legitimate, non-discriminatory reason for an adverse action, "the plaintiff then must prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but merely a pretext for illegal discrimination." Adair, 452 F.3d at 489. The plaintiff may meet this burden by showing "(1) the proffered reason had no factual basis, (2) the proffered reason did not actually motivate [the defendant's] action, or (3) the proffered reason was insufficient to motivate the action." Id. (citing Cicero v. Borg-Warner Auto., Inc., 280 F.3d 579, 589 (6th Cir. 2002)).

The Plaintiff maintains that the Defendants' proffered reason did not actually motivate them to fire him. To succeed on such an argument, a plaintiff must show that the "sheer weight of the circumstantial evidence of [retaliation] makes it more likely than not that the employer's explanation is a pretext, or coverup." Manzer v. Diamond Shamrock Chems. Co., 29 F.3d 1078, 1084 (6th Cir. 1994) (internal quotation marks omitted), overruled on other grounds by Geiger v. Tower Auto., 579 F.3d 614 (6th Cir. 2009). To support his argument, the Plaintiff points to Reckner's deposition testimony that he did not feel the Plaintiff's behavior at the dinner in Oklahoma City warranted termination. Instead, the Plaintiff notes, Reckner testified that only his

34

feelings were hurt. In the Plaintiff's view, this testimony effectively demonstrates that the proffered reason for his firing had no factual basis.

The Court disagrees. It is true that Reckner did not recommend that the Plaintiff be fired based on the Plaintiff's behavior at the dinner in Oklahoma City. Reckner Dep. at 49–50.[10] However, Honer, the CEO of Defendant Shop24 Global, not Reckner, made the decision to fire the Plaintiff, and the Plaintiff points to no evidence that suggests that Honer did not honestly believe that the Plaintiff's behavior at the dinner in Oklahoma City had been unprofessional and insubordinate. Reckner's testimony therefore does not permit the inference that the Defendants' stated reason for firing the Plaintiff was a pretext.

The Plaintiff's remaining evidence of pretext is the temporal proximity between his filing of the instant lawsuit and his termination three weeks later. While temporal proximity alone may be sufficient to establish a causal connection as part of a plaintiff's prima facie case of retaliation, it is insufficient to raise a general issue of material fact as to pretext. Pettit v. Steppingstone, Ctr. for the Potentially Gifted, 429 F. App'x 524, 535–36 (6th Cir. 2011); see also Skrjanc v. Great Lakes Power Serv. Co., 272 F.3d 309, 317 (6th Cir. 2001) (in the context of the FMLA, holding that "temporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual"); Conner v. Schnuck Mkts., Inc., 121 F.3d 1390, 1397–98 (10th Cir. 1997) (concluding that temporal proximity alone does not constitute a pretext for retaliatory discharge under the Fair Labor Standards Act). Because the Plaintiff cannot prove that the Defendants' legitimate, non-discriminatory reason for terminating his employment was pretextual, the Defendant is entitled to summary judgment on Count Two of the Third Amended Complaint.

---

[10] To the extent that the Plaintiff asserts that Reckner merely felt hurt by the Plaintiff's comments, the Court notes that Reckner also testified that he felt threatened by those same comments. Id. at 51–52.

C.  *Count Three – Ohio Minimum Fair Wage Standards Act – Unpaid Overtime*

The Plaintiff brings Count Three of his Third Amended Complaint under the Ohio

Minimum Fair Wage Standards Act, which provides:

> An employer shall pay an employee for overtime at a wage rate of one and one-
> half times the employee's wage rate for hours worked in excess of forty hours in
> one workweek, in the manner and methods provided in and subject to the
> exemptions of section 7 and section 13 of the "Fair Labor Standards Act of 1938,"
> 52 Stat. 1060, 29 U.S.C.A. 207, 213, as amended.

O.R.C. § 4111.03(A). "Courts have uniformly held that Ohio's wage and hour law should be

interpreted in accordance with the FLSA." Mitchell, 428 F. Supp. 2d at 732 (citing Douglas v.

Argo-Tech Corp., 113 F.3d 67 n. 2 (6th Cir. 1997)).[11] Accordingly, for the same reasons as with

Count One of the Plaintiff's Third Amended Complaint, the Plaintiff's Motion for Partial

Summary Judgment as to Count Three will be denied.


D.  *Count Four – Ohio Const. Art. II, § 34a – Failure to Maintain Records*

The Plaintiff argues that the Defendants violated the Ohio Constitution by failing to

maintain proper wage and hour records and by failing to provide those records to the Plaintiff

upon request. According to the Plaintiff, he requested that these records be provided to him

during discovery but the Defendants failed to do so because the records do not exist.

In response, the Defendants concede "that they did not track the amount of hours that

Plaintiff worked on a given day[.]" Defs.' Resp. in Opp. at 33. However, the Defendants

maintain that whether they violated Art. II, § 34 of the Ohio Constitution turns on whether the

Plaintiff was properly classified as an executive or administrative employee. They cite the Ohio

Revised Code which provides an exception to § 34a's recordkeeping requirement for individuals

---

[11] The Plaintiff agrees with this statement of the law. See Pl.'s Mot. for Partial Summ. J. at 8 n.2.

who are not subject to the overtime pay requirements under the Ohio Minimum Fair Wage Standards Act. Because there is a genuine issue of material fact as to whether the Plaintiff was subject to the overtime pay requirements of the FLSA and the Ohio Minimum Fair Wage Standards Act, the Defendants insist that a general issue of material fact exists with respect to Count Four of the Plaintiff's Third Amended Complaint.

Article II, § 34a of the Ohio Constitution establishes a minimum wage and requires employers to "maintain a record of the name, address, occupation, pay rate, hours worked for each day worked and each amount paid an employee for a period of not less than three years following the last date the employee was employed." OHIO CONST. art. II, § 34a. Under this section, employers are required to provide these records to employees or their representatives upon request. See id.

The Ohio General Assembly may pass laws to implement the provisions of § 34a. Id. Pursuant to this authority, the General Assembly codified § 34a's requirement that employers maintain wage and pay records. O.R.C. § 4111.14(F). However, the statute further provides that:

> An employer is not required to keep records of "hours worked for each day worked" for individuals for whom the employer is not required to keep those records under the Fair Labor Standards Act and its regulations or individuals who are not subject to the overtime pay requirements specified in section 4111.03 of the Revised Code.

Id. § 4111.14(F)(4)(b).

Here, a genuine issue of material fact exists as to whether the Defendants properly classified the Plaintiff as an exempt employee not subject to the Ohio Minimum Fair Wage Standards Act's overtime pay requirement. If the Defendants properly classified the Plaintiff as an exempt employee, then they were not required to maintain wage and hour records for him. See O.R.C. § 4111.14(F)(4)(b) ("An employer is not required to keep records of 'hours worked

for each day worked" for individuals . . . who are not subject to the overtime pay requirements specified in section 4111.03 of the Revised Code"). However, if the Defendants improperly classified the Plaintiff as an exempt employee, then their failure to maintain wage and hour records for him would be a violation of Article II, § 34a of the Ohio Constitution and O.R.C. § 4111.14(F). A jury must resolve the underlying factual dispute concerning the Plaintiff's classification before a determination can be made as to any violations of Article II, § 34a of the Ohio Constitution and O.R.C. § 4111.14(F). Therefore, the Plaintiff's Motion for Partial Summary Judgment will be denied as to Count Four.


E.       *Is Defendant RDO Equipment Co. an "employer" for purposes of the FLSA and the Ohio Minimum Fair Wage Standards Act?*

The Defendants next argue that Defendant RDO Equipment is entitled to summary judgment on all counts of the Plaintiff's Third Amended Complaint because it was not an employer for purposes of the FLSA and the Ohio Minimum Fair Wage Standards Act. Examining the definition of employer under the Acts, the Defendants emphasize that Defendant RDO Equipment had a tenuous, at best, connection to Defendant Shop24 Global. According to the Defendants, Defendant RDO Equipment's sole connection to Defendant Shop24 Global is that its owners are also investors in a limited partnership that is the majority owner of Defendant Shop24 Global. Further, the Defendants contend, Marvin Setness, the putative agent of Defendant RDO Equipment, did not have substantial control of the terms and conditions of the Plaintiff's work.

In response, the Plaintiff maintains that his daily interactions with Setness, Defendant RDO Equipment's agent, demonstrate that Setness was effectively his second boss who had significant control over the terms and conditions of his employment. Specifically, the Plaintiff

asserts that Setness controlled his work with respect to him approving and paying invoices, ordering inventory supplies, and reporting and reimbursing travel expenses. Further, the Plaintiff notes, Setness managed the Defendants' payroll system and the Defendants used Defendant RDO Equipment for payroll processing, human resources, and other administrative functions. In conclusion, the Plaintiff contends that, even if the Court cannot find that Defendant RDO Equipment was his employer as a matter of law, there is a genuine issue of material fact as to whether Defendant RDO Equipment exercised substantial control over the terms and conditions of his work, maintained his employment records, and established the rate and method of payment for his work. Therefore, the Plaintiff argues, the Defendants' Motion for Partial Summary Judgment should be denied.

The FLSA defines an employer as "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). The Ohio Minimum Fair Wage Standards Act mirrors this definition. See O.R.C. § 4111.03(D)(2) (an "Employer" means "any person or group of persons . . . acting in the interest of an employer in relation to an employee"). Given the remedial nature of the FLSA, courts define the term employer "more broadly than would be interpreted in traditional common law applications." Dole v. Elliott Travel & Tours, Inc., 942 F.2d 962, 965 (6th Cir. 1991).

Courts consider the "'economic reality' of the relationship between a plaintiff and a defendant" to determine whether a party is an employer. Ellington v. City of E. Cleveland, 689 F.3d 549, 555 (6th Cir. 2012). In analyzing the relationship between a plaintiff and a defendant, courts consider:

(1)     whether the plaintiff is an integral part of the operations of the putative employer;

(2)     the extent of the plaintiff's economic dependence on the defendants;

(3)     the defendant's substantial control of the terms and conditions of the work of the plaintiff;

(4)     the defendant's authority to hire or fire the plaintiff; and

(5)     whether the defendant maintains the plaintiff's employment records and establishes the rate and method of payment

Id. (internal citations and quotations omitted). This analytical approach requires a case-by-case analysis of "the circumstances of the whole business activity." Id. Ultimately, whether an entity is an employer for purposes of the FLSA is a question of law, rather than fact. Dep't of Labor v. Cole Enters., Inc., 62 F.3d 775, 778 (6th Cir. 1995) (citing Dole, 942 F.2d at 965).

Here, the Plaintiff concedes that he was not an integral part of the operations of Defendant RDO Equipment and that he was not economically dependent on Defendant RDO Equipment. Pl.'s Resp. in Opp. at 41. The Plaintiff further acknowledges that there is no evidence that Defendant RDO Equipment had the ability to hire or fire him. Id. at 42.

The Plaintiff nonetheless argues that Defendant RDO Equipment exercised substantial control over the terms and conditions of his work. Here, the record indicates that Setness, Defendant RDO Equipment's purported agent, supervised the Plaintiff's acquisition of parts and expenditures for travel expenses. Clark Dep. at 164. For parts over "a few thousand" dollars, the Plaintiff was required to get Setness's approval. Id. at 164–65. Setness would execute payment for invoices approved by the Plaintiff. Id. at 204–05, 215–16. Setness also communicated with the Plaintiff on a regular basis to determine the number of hours worked by Weygandt and Parker so that he could forward that information to an outside payroll service. Setness Aff. at ¶ 3. Setness's responsibilities required frequent contact with the Plaintiff. See Clark Dep. at 164 (the Plaintiff testified that he interacted with Setness "[o]ften. If not daily, almost every day."); Setness Aff. at ¶ 5 (attesting that he "would speak or correspond with [the Plaintiff]

approximately once per week"). Further, Defendant RDO Equipment processed Defendant Shop24 Global's payroll. Defs.' Resp. to Pl.'s Interrogs. at 2–3.

Even when construed in the light most favorable to the Plaintiff,[12] the evidence above does not demonstrate that Defendant RDO Equipment exercised substantial control over the terms and conditions of the work of the Plaintiff. Setness had no authority to hire or fire the Plaintiff. Setness Aff. at ¶ 6; see also Pl.'s Resp. in Opp. at 42 ("there is no evidence that Setness had the ability to hire or terminate the employees of Shop24 Global"). He could not set or alter the Plaintiff's rate of pay or the Plaintiff's work schedule. Setness Aff. at ¶ 6. Nor is there any evidence that Setness could alter the Plaintiff's work duties and responsibilities. The record certainly demonstrates that Setness performed a variety of administrative and clerical tasks that facilitated the operation of Defendant Shop24 Global. But those administrative and clerical tasks do not demonstrate that he possessed substantial control over the terms and conditions of the work of the Plaintiff.

Each of the first four factors in this case each weigh against a finding that Defendant RDO Equipment was the Plaintiff's employer. The Plaintiff concedes (1) that he was not an integral part of the operations of and (2) that he was not economically dependent on Defendant RDO Equipment. Moreover, the record demonstrates that Defendant RDO Equipment (3) did not have substantial control of the terms and conditions of the Plaintiff's work and (4) did not have the authority to hire or fire the plaintiff. When considered together, these factors support a

---

[12] The Plaintiff misrepresents the record when he asserts that "Setness held himself out as Clark's employer . . . Setness represented to Clark that he had the ability to determine Clark's exemption status and rate of pay[.]" In support of this assertion, the Plaintiff cites an email sent by him to Setness in which he inquired as to his exempt classification under the FLSA. See Clark Dep. at 355 – Exhibit 50, doc. 72-1. Setness did not respond to this email and, without a response or other admissible evidence, there is no basis for such an assertion by the Plaintiff.

finding that Defendant RDO Equipment was not the Plaintiff's employer.[13] Therefore, the Court concludes as a matter of law that Defendant RDO Equipment is entitled to summary judgment on all counts of the Plaintiff's Third Amended Complaint.

### F.    *Successor in Interest Liability*

The Defendants finally argue that Defendant Shop24 Global is entitled to summary judgment on the Plaintiff's claims for overtime compensation prior to June 30, 2010, the date on which Defendant Shop24 Global entered into an asset purchase agreement with Defendant Shop24 USA. The asset purchase agreement between the two stated that Defendant Shop24 Global would not assume any liabilities of Defendant Shop24 USA that were not explicitly set forth in the agreement. The agreement provided that Defendant Shop24 Global would assume liability only for $8,822 in backpay owed to the Plaintiff by Defendant Shop24 USA. Under Ohio law, the Defendants assert that the transfer agreement is enforceable and that Defendant Shop24 Global cannot be held liable for any overtime compensation for the time period prior to June 30, 2010.

In response, the Plaintiff contends that successor liability applies in this case regardless of the asset purchase agreement between Defendant Shop24 USA and Defendant Shop24 Global. Applying the federal common law standard for successor liability, the Plaintiff argues that Defendant Shop24 Global can provide the relief sought in the instant suit and the continuity

---

[13] The fifth factor in the "economic realities" analysis is whether the defendant maintained the plaintiff's employment records and established the rate and method of payment. This factor is mixed. As has previously been discussed, Setness had no authority to set or alter the Plaintiff's rate of pay. The Plaintiff identifies weak, but admissible evidence that indicates Setness may have maintained some of the Plaintiff's employment records and had some part in determining the method in which Defendant Shop24 Global employees were paid. Pl.'s Resp. in Opp. at 41, 43. However, when viewed in the context of the four other factors, the mixed nature of the fifth factor does not compel a finding in the Plaintiff's favor.

between Defendant Shop24 USA and Defendant Shop24 Global supports the imposition of successor liability in this case.

In reply, the Defendants do not address the merits of the Plaintiff's successor liability argument. Instead, they assert that the Plaintiff has procedurally defaulted on this argument by failing to raise it previously. The Defendants maintain that a party may not expand its claims to assert new theories in response to summary judgment. According to the Defendants, the proper method for the Plaintiff to raise his successor liability theory was by amending the complaint in accordance with Rule 15(a). Because the Plaintiff has not filed any motion to amend, the Defendants argue the Court should disregard the Plaintiff's successor liability argument entirely.

A plaintiff may not assert a new claim or theory of recovery in response to a motion for summary judgment. Hyland v. HomeServices of Am., Inc., 771 F.3d 310, 323 (6th Cir. 2014); Tucker v. Union of Needletrades, et al., 407 F.3d 784, 788 (6th Cir. 2005). The question before the Court is whether the Defendants had notice of the Plaintiff's successor liability theory prior to the filing of his response in opposition.

Here, there is no explicit reference to a theory of successor liability in the Plaintiff's Third Amended Complaint. Nonetheless, the record suggests that the Defendants had notice of the Plaintiff's successor liability theory. From the beginning of this case, the Plaintiff has sought overtime compensation from the Defendants for the period of time from September 2009 to September 2012 despite the transfer of assets from Defendant Shop24 USA to Defendant Shop24 Global. In light of Defendant Shop24 USA's lack of assets, it should not be a surprise to the Defendants that the Plaintiff would seek to recover that unpaid overtime under a theory of successor liability. The Defendants appear to have implicitly recognized that the theory of successor liability was at issue in this case—they filed a motion for summary judgment arguing

43

that Defendant Shop24 Global, the putative successor, was not legally responsible for Defendant Shop24 USA's liabilities pursuant to the asset transfer agreement. Why would the Defendants make this argument unless they believed that the Plaintiff's might be able to recover damages from Defendant Shop24 Global under a theory of successor liability?

This is a close case. The prohibition on plaintiffs raising new theories at the summary judgment stage is to protect defendants from "unfair surprise." Tucker, 407 F.3d at 788. But here the Defendants appear to have been cognizant of the Plaintiff's reliance on a theory of successor liability prior to the summary judgment stage. Despite the lack of explicit reference to successor liability in the Plaintiff's complaints, the allegations contained in the Third Amended Complaint, particularly with respect to the issue of damages, were sufficient to put the Defendants on notice of the Plaintiff's potential reliance on a theory of successor liability. Consequently, the Defendants are not subject to unfair surprise by the Plaintiff's reliance on that theory now.

The Sixth Circuit has not directly decided whether successor liability applies in the context of the FLSA, but "it has adopted the federal common law of successor liability in employment law cases. Thompson v. Bruister & Associates, Inc., No. 3:07-00412, 2013 WL 1099796, at *4–5 (M.D. Tenn. Mar. 15, 2013) (hereinafter Bruister) (collecting cases). Other circuit courts that have considered the question directly have uniformly approved the application of successor liability under the FLSA. See Thompson v. Real Estate Mortg. Network, 748 F.3d 142, 151 (3d Cir. 2014) ("Two of our sister circuits have addressed the merits of this issue and concluded that application of the federal standard to claims under the FLSA is the logical extension of existing case law. We agree."); Teed v. Thomas & Betts Power Solutions, 711 F.3d 763, 765–67 (7th Cir. 2013); Steinbach v. Hubbard, 51 F.3d 843, 845 (9th Cir. 1995).

Like the district court in Bruister, the Court agrees that:

> Given that the Sixth Circuit has recognized successor liability in the employment context, given that courts which have directly addressed the issue unanimously appear to hold that successor liability can be appropriate in FLSA cases, given that the remedial purposes of the FLSA require the courts to define employer more broadly than the term would be interpreted in traditional common law applications, and given the absence of any convincing arguments or authority to the contrary, the Court finds that, in appropriate cases, the doctrine of successor liability should be applied in FLSA cases.

2013 WL 1099796, at *6 (internal citations, quotations, and alterations omitted). See also Teed, 711 F.3d at 765–67 (Posner, J.) (thoroughly explaining the basis for applying successor liability in the context of the FLSA). To the extent that Defendant Shop24 relies on the limitation of liability provision in the asset transfer agreement as a defense, that provision does not control when the federal standard for successor liability is at issue. See Teed, 711 F.3d at 765 ("One condition specified in the transfer of the assets to Thomas & Betts pursuant to the auction was that the transfer be 'free and clear of all Liabilities' that the buyer had not assumed, and a related but more specific condition was that Thomas & Betts would not assume any of the liabilities that Packard might incur in the FLSA litigation. . . . If Wisconsin state law governed the issue of successor liability, Thomas & Betts would be off the hook because of the conditions. But as we said, they do not control, or even figure, when the federal standard applies.")

In the Sixth Circuit, "the appropriateness of successor liability depends on whether the imposition of such liability would be equitable." Cobb v. Contract Transp., Inc., 452 F.3d 543, 554 (6th Cir. 2006). To determine the applicability of successor liability in the employment context, courts balance "1) the interests of the defendant-employer, 2) the interests of the plaintiff-employee, and 3) the goals of federal policy, in light of the particular facts of a case and the particular legal obligation at issue." Id. (citing EEOC v. MacMillan Bloedel Containers, Inc., 503 F.2d 1086, 1091 (6th Cir. 1974)). In balancing these competing interests and goals, courts consider a number of relevant factors, including:

45

> (1) whether the successor company has notice of the charge; (2) the ability of the
> predecessor to provide relief; (3) whether the new employer uses the same plant;
> (4) whether there has been substantial continuity of business operations; (5)
> whether the new employer uses the same or substantially same workforce; (6)
> whether the new employer uses the same or substantially same supervisory
> personnel; (7) whether the same jobs exist under substantially the same working
> conditions; (8) whether [the defendant] uses the same machinery, equipment and
> methods of production; and (9) whether [the defendant] produces the same
> product.

Cobb, 452 F.3d at 554 (citing MacMillan, 503 F.2d at 1094). Each factor is not relevant in every

case, and "[t]he ultimate inquiry always remains whether the imposition of the particular legal

obligation at issue would be equitable and in keeping with federal policy." Cobb, 452 F.3d at 554

Here, with respect to the first factor, the Plaintiff concedes that the Defendant Shop24

Global did not have notice of the Plaintiff's lawsuit as of June 30, 2010, the date on which it

acquired Defendant Shop24 USA's assets.[14] Pl.'s Resp. in Opp. at 55.

The second factor weighs in favor of successor liability. Defendant Shop24 USA, the

alleged predecessor, was insolvent and unable to pay the Plaintiff's salary. Clark Dep. at 79–81.

From this fact, a reasonable inference can be drawn that Defendant Shop24 USA would not be

able to satisfy any relief (i.e. unpaid overtime compensation) to which the Plaintiff may be

entitled now. This inference is strengthened by the fact of the asset transfer agreement between

Defendant Shop24 USA and Defendant Shop24 Global—as a result of that agreement,

---

[14] In one sense, the first factor—whether Defendant Shop24 Global had notice of the charge (the instant suit) at the time it acquired Defendant Shop24 USA's assets—is irrelevant to the case at hand. Because this lawsuit was not filed until two years after it acquired Defendant Shop24 USA's assets, Defendant Shop24 Global could not have had such notice. On the facts of this case, a better question to consider is whether Defendant Shop24 Global had notice of the Plaintiff's potential claims for unpaid overtime when they acquired Defendant Shop24 USA's assets. The record indicates that Defendant Shop24 Global potentially had notice of these claims. The Plaintiff first expressed his concerns regarding his lack of overtime pay and his exempt classification under the FLSA during his employment with Defendant Shop24 USA prior to the asset transfer agreement between Defendant Shop24 Global and Defendant Shop24 USA. Clark Dep. at 337–38. Given the continuity in business operations between Defendant Shop24 Global and Defendant Shop24 USA, it is reasonable to infer that Defendant Shop24 Global was aware of the Plaintiff's potential claims at the time they acquired Defendant Shop24 USA's assets.

46

Defendant Shop24 USA does not have any assets from which any damages incurred by the Plaintiff during his employment there could be satisfied.

The remaining factors also weigh in favor of successor liability in this case. The Plaintiff has presented evidence that his responsibilities, working conditions, and supervisor did not change despite the transfer of assets from Defendant Shop24 USA to Defendant Shop24 Global. Defendant Shop24 Global continued to employ the same workforce, operate in the same manner, and provide the same product as its alleged predecessor, Defendant Shop24 USA. While some of these facts are disputed, the Plaintiff has presented sufficient evidence to create a genuine issue of material fact as to whether Defendant Shop24 Global is subject to successor liability in this case. Consequently, the Defendants' request that summary judgment be entered in favor of Defendant Shop24 Global on the Plaintiff's FLSA claim for the time period prior to June 30, 2010 will be denied.

This does not end the inquiry into successor liability. The Plaintiff has also brought a claim for unpaid overtime against Defendant Shop24 USA under the Ohio Minimum Fair Wage Standards Act. The federal standard for successor liability is not applicable under the Ohio Act. See Thompson, 748 F.3d at 153 ("We must give separate consideration to Thompson's claims under the New Jersey Wage and Hour Law. Because these claims were cognizable in the District Court only by virtue of supplemental jurisdiction, they are governed by the New Jersey standard for successor liability."). Therefore, the Court turns to Ohio law concerning the issue of successor liability.

As a general rule, "the purchaser of a corporation's assets is not liable for the debts and obligations of the seller corporation." Welco Indus., Inc. v. Applied Cos., 617 N.E.2d 1129, 1132 (1993). Courts have recognized exceptions to this rule, holding that a successor corporation

may be held liable when: "(1) the buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a de facto consolidation or merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability." Id.

Here, the Defendants appear to argue that Defendant Shop24 Global is not liable for the obligations of Defendant Shop24 USA because they did not expressly or impliedly agree to assume such obligations in their asset transfer agreement. Defs.' Mot. for Partial Summ. J. at 29–30. However, they have failed to argue an absence of genuine issues of material facts as to the remaining exceptions. Consequently, their request for summary judgment will be denied.

## IV. Conclusion

For the foregoing reasons, the Court GRANTS IN PART AND DENIES IN PART the Defendants' Motion for Partial Summary Judgment (doc. 66) and DENIES the Plaintiff's Motion for Partial Summary Judgment (doc. 67).

IT IS SO ORDERED.

s/ James L Graham
James L. Graham
UNITED STATES DISTRICT JUDGE

Date: January 16, 2015